```
          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MARYLAND

                                 :
JERMAINE SAMUEL
                                 :

    v.                           :   Civil Action No. DKC 19-0400

                                 :
PORTS AMERICA, CHESAPEAKE, LLC,
et al.                           :
```

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this case brought under 42 U.S.C § 1981 are (1) a motion to dismiss, or in the alternative, for summary judgment, filed by Defendant International Longshoremen's Association Local 333 ("Local 333"), (ECF No. 23), (2) a motion to dismiss filed by Defendants Steamship Trade Association of Baltimore, Inc. ("STA") and Ports America Chesapeake, LLC ("PAC"), (ECF No. 24), (3) a corrected motion to dismiss filed by Defendants STA and PAC, (ECF No. 32), and (4) a motion to submit affidavits pursuant to Fed.R.Civ.P. 56(e)(1) filed by Plaintiff Jermaine Samuel, (ECF No. 41).  For the following reasons, Defendants' respective motions to dismiss/for summary judgment will be granted and the case will be dismissed. The motion to submit affidavits will be denied as moot.

I.  **Background**[1]

Jermaine Samuel has worked as an employee of PAC since 2012. PAC is a member-employer of STA, a multi-employer association. STA has a collective bargaining agreement ("CBA") with Local 333, a union representing employees who perform cargo handling for stevedoring and marine terminal operator employers. Mr. Samuel is a member of Local 333. Mr. Samuel is African American.

Since the fall of 2016, PAC has operated a terminal called the Intermodal Container Transfer Facility ("ICTF"). Prior to that, a railroad operator called CSX operated the ICTF.[2] Even during CSX's ownership of the ICTF, however, PAC "provided the labor" for the operation of the ICTF.

Among the equipment at the ICTF were two pieces of machinery called the Transtainer and Side Loader. According to Plaintiff,

---

[1] Unless otherwise noted, all facts are drawn from Plaintiff's corrected first amended complaint (ECF No. 29) and construed in the light most favorable to Plaintiff.

[2] The complaint states that "PAC owned and operated the ICTF since around the Fall of 2015[.]" (ECF No. 29, ¶ 30). This appears to be a typographical error. As discussed below, Plaintiff was afforded the opportunity to file an amended complaint, and then a corrected amended complaint. Each of these additional complaints cite Local 333's now-mooted, original memorandum of law in support of motion to dismiss/motion for summary judgment, (ECF No. 13-1), as the source for their claim that ownership of the ICTF changed hands in the fall of 2015. Local 333's memorandum, however, notes that "PAC has operated a terminal called the Intermodal Container Transfer Facility ("ICTF") since around the fall of *2016*." (*Id*. at 2) (emphasis added). This is just one of several clear errors regarding the timeline of events which remain in Plaintiff's complaint even after an amendment and later correction.

"in early 2015," PAC/STA employees and Local 333 members Brian Dolch and Ryan Uhlik – who are both White – were provided training in the use of the Transtainer and the Side Loader.  Notably, this must have been *very* early in 2015, because on January 5, 2015, 26 members of Local 333 filed a grievance alleging that STA and PAC had committed a "direct violation of the Seniority, Hiring and Dispatching, and Training provisions" of the CBA.  (ECF No. 18-1, at 1)[3].  The conduct with which the grievants took issue was "regarding Ports America Chesapeake and the STA allowing employee Brian Dolch and possibly others to receive and/or be paid for training on Toploader, Transtainer and/or other heavy machinery at the ICTF Railhead."  (*Id.*).  The grievance makes no mention of suspected racial discrimination.  Indeed, four of the grievants were White, while 22 were African American.

Other than the filing of the first grievance in January 2015, the rest of the timeline is difficult, bordering on impossible, to discern from the corrected amended complaint.  Aside from the confusing, non-chronological relation of events, the complaint is also so riddled with contradictory statements and conflicting dates that it approaches incoherence.  At one point, Plaintiff

---

[3] Plaintiff's Amended Complaint is filed as ECF No. 18.  His *corrected* Amended Complaint is filed as ECF No. 29.  Plaintiff did not attach his exhibits to the corrected amended complaint.  Therefore, citations to the complaint itself will be to ECF No. 29, while citations to the grievance will be to ECF No. 18-1.

says that "[b]ecause Dolch was provided favorable training opportunities ahead of other PAC employees/Local 333 members, 'Dolch became a regular operator at the ICTF in the toploader and transtainer . . . on October 6, 2014,' years ahead of Plaintiff (who has yet to obtain transtainer certification)." This seems to imply that Dolch received training *prior* to October 2014, which would contradict Plaintiff's claim that Dolch received this training "in early 2015." Confusingly, in a footnote, Plaintiff quotes from an exhibit submitted by Defendants, stating that "[i]n part because Dolch oerated [*sic*] the transtainer at the ICTF nearly every weekend since October 6, 2016, he qualified with 400-hours of operating experience in the toploader/sideloader before Plaintiff and Uhlik." In other words, the corrected amended complaint states that Dolch received Transtainer training in "early 2015," became a "regular operator" of the Transtainer in October 2014 and began operating the Transtainer "nearly every weekend" beginning in October 2016.

Later in the corrected amended complaint, Plaintiff states that "[o]n or around February 10, 2017, Dolch was given his certification for the port-wide top loader and already had his certification for the side loader. Dolch was able to receive his certification without being tested on either piece of equipment." Plaintiff then states that "[o]n or around February 14, 2017, Uhlik was also given his certification on the toploader and sideloader

4

without being tested on either piece of equipment." In the very next sentence, Plaintiff states that "Uhlik and Dolch both received certification cards in late February 2016." Yet, at another point, Plaintiff says that he filed his own grievance on August 20, 2015 in response to the fact "that Dolch and Uhlik became certified in the toplaoder [*sic*] and transtainer[.]" (footnote omitted). Mr. Samuel claims that there was an error in his grievance, and that in August 2015, Mr. Samuel was really filing a grievance about Dolch and Uhlik being certified in the *Side* Loader. But even if Mr. Samuel did mean to complain about Dolch's and Uhlik's certifications in the *Side* Loader, he has still alleged that Uhlik received his certification card in February 2016, and "was . . . given his certification on the toploader and sideloader" in February 2017. In other words, Mr. Samuel's grievance regarding Uhlik's alleged certification on the Side Loader was filed either six or 18 months prior to the date on which he claims Uhlik was actually certified on the Side Loader.

As for Plaintiff's own experience with training, the timeline is no less confused. Mr. Samuel alleges that, at one point, he did not pursue training on the Transtainer or Side Loader because William Perry, another African American PAC employee, was denied the opportunity to operate certain machinery prior to certification. Perry allegedly was told that he could not operate the machinery prior to certification because doing so would

constitute an OSHA violation. The corrected amended complaint provides no indication of when Mr. Perry was told this, or when Mr. Samuel learned of Mr. Perry's alleged denial of training.

Furthermore, the complaint is clear that Mr. Samuel eventually *did* seek out – and receive – training on the Side Loader. Again, Plaintiff states that he filed his own grievance on August 20, 2015 "alleging that Dolch and Uhlik became certified in the toplaoder [*sic*] and transtainer, and that Plaintiff was not being trained in the order of his seniority[.]" (footnote omitted). Plaintiff next states that "in February 2016 . . . Plaintiff was granted the opportunity to be trained on the Side Loader, but was put in the Top Loader class, which he passed." Mr. Samuel apparently takes issue with the fact that he was put in the Top Loader class. Again though, Mr. Samuel admits that in his August 2015 grievance, he accidentally complained of training afforded to Dolch and Uhlik on the *Top* Loader when he meant to say *Side* Loader.

Mr. Samuel then suggests that he *was* actually allowed to train on the Side Loader, but does not indicate when this occurred: "When Plaintiff was allowed to train on the Side Loader, he was required to stack 6 boxes in 15 minutes, whereas Dolch and Uhlik were not required to stack boxes within any time limit in order to be certified." Yet this was apparently not an issue, since Mr. Samuel states that he "passed both the top loader and side loader[.]"

6

Then, despite Mr. Samuel's claim that he passed *both* the Side Loader and the Top Loader, he "was told that he had only qualified to operate the side loader." Only later, after "2 days of operation orientation" was he "finally . . . considered certified for the portwide top loader on September 25, 2016[.]" Plaintiff indicates that after passing his training requirements on both the Top Loader and Side Loader, he asked for, but was denied, his certification card. Plaintiff states that, to date, he has not been allowed to train on the Transtainer at all.

Further confusing the matter, Plaintiff states that on May 24, 2016, in response to his own grievance, Mr. Samuel was told that he "was eligible to apply for I.C.T.F. training opportunities when he had worked 400 hours in the Side loader at the I.C.T.F. and would meet the prerequisite for ICTF Transtainer operator training." As best the court can tell, Plaintiff's contention is that he began training on the Side Loader at some point during or after February 2016 but was told in May 2016 that he would need 400 hours of work on the Side Loader before he could qualify for training on the Transtainer. Plaintiff claims that Dolch and Uhlik were not required to work 400 hours on the Side Loader before receiving training on the Transtainer.

Yet Plaintiff himself seems to admit that Dolch and Uhlik were subject to the 400-hour certification requirement in some form. Mr. Samuel notes that "the STA and PAC Defendants admit

7

that because Dolch was allowed to work on the machinery at the ICTF . . . he was able to use his time to qualify in the toploader/sideloader before Plaintiff."  Mr. Samuel provides a footnote citation for this claim in which he quotes from STA and PAC's memorandum in support of their motion to dismiss:  "In part because Dolch oerated [sic] the transtainer at the ICTF **nearly every weekend since October 6, 2016, he qualified with 400-hours of operating experience in the toploader/sideloader before Plaintiff and Uhlik**."  (Citing ECF No. 24-1, at 7) (Emphasis in original).  It would appear then that Dolch was required to accrue 400 hours on the Transtainer before "qualifying" for the "toploader/sideloader."

Adding to the confusion, the complaint sheds little to no light on certain basic facts about the training and certification process.  The order of events between training, being certified, receiving one's certification card, completing a 400-hour requirement, and becoming a regular operator of machinery is totally unclear.  Plaintiff is alleging a double-standard, but it is not evident from the complaint that there was *any* standard at all.  Rather, training, being certified, receiving a certification card, hitting 400 hours, and becoming a regular operator seemed to occur in random, idiosyncratic orders for each employee.

The corrected amended complaint suggests that Dolch (1) became a regular operator of the Top Loader and Transtainer in

8

October 2014, (2) began receiving training on the *Side* Loader and Transtainer in "early 2015," (3) "became certified in the [Side Loader] and Transtainer" some time prior to August 20, 2015, (4) received certification cards – for what, exactly, the complaint does not say – in February 2016, (5) began operating the Transtainer nearly every weekend beginning in October 2016, and (6) "was given his certification for the port-wide top loader" in February 2017.  This chronology is, of course, incomplete, because while the complaint alleges that Mr. Dolch was "certified" in the Side Loader prior to February 2017, it provides no indication when exactly that was.

As for Uhlik, the complaint suggests that he (1) began training in the Transtainer and Side Loader "in early 2015," (2) became certified in the Side Loader and Transtainer at some time prior to August 20, 2015, (3) "received certification cards" for unspecified equipment in late February 2016, and (4) "was given his certification on the toploader and sideloader" in February 2017.

For Mr. Samuel, the order of events was (1) beginning training on the Top Loader in February 2016, (2) "pass[ing] both the top loader and sideloader" at some unspecified later date, (3) being told at some point between his "passing the side loader" and September 24, 2016 that "he had . . . qualified to operate the

9

side loader," and (4) "being considered certified for the portwide top loader on September 25, 2016[.]"

Thus, while Plaintiff alleges that Dolch and Uhlik received training on the Side Loader and Transtainer before he did, Mr. Samuel also alleges that he received his certification in the Top Loader in September 2016, roughly four and a half months before either Dolch or Uhlik received their certifications for the Top Loader.  Mr. Samuel does not include any allegations regarding when, specifically, Mr. Dolch received his certification in the Side Loader, but he claims to have been aware of both Mr. Dolch and Mr. Uhlik being certified in the Side Loader prior to August 20, 2015.  But again, Mr. Samuel contradicts the pre-August 2015 Side Loader certification date for Mr. Uhlik by alleging that Mr. Uhlik received certification on the Side Loader in February 2017. Mr. Samuel seems to indicate that he himself was certified for the Side Loader sometime between February and October 2016, but when exactly, he does not say.

Much of Defendants' response to Plaintiff's allegations is incorporated into Plaintiff's amended complaint.[4]   Defendants

---

[4] Plaintiff has taken the unusual step of expressly addressing much of his amended complaint to arguments raised in Defendants' original motions to dismiss, citing frequently to their memoranda of law and even to exhibits attached thereto.  In some areas, Plaintiff has cited to Defendants' statements and exhibits as facts.  In other areas, he cites them in order to dispute their veracity, or to highlight a different interpretation of events. "[W]hen a defendant attaches a document to its motion to dismiss,

state that Dolch and Uhlik volunteered to "shadow" the operators of the Transtainer and Side Loader, and that this shadowing system was commonplace and widely available. Plaintiff states, however, that neither he nor the other grievants were aware of the shadowing system; in his complaint, Plaintiff notes that in their original motion to dismiss, Local 333 cites to the affidavit of Lawrence Johnson, Jr. the then "acting Walking Director for Local 333," who allegedly informed Plaintiff of the availability of "shadowing" as a means of training. Plaintiff states, however, that he was "not aware of this opportunity." Plaintiff supports his argument that the opportunity to shadow was not widely known by suggesting that the January 5, 2015 grievance is evidence that none of the signatories knew "that they could 'shadow' to receive training at the ICTF." The January 2015 grievance mentioned the possibility

---

'a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiff[ ] do[es] not challenge its authenticity.'" *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999) (emendations in original)). In the Fourth Circuit, documents referenced and relied upon by the plaintiff can be considered without converting a motion to dismiss into a motion for summary judgment. *See Sec'y of State for Defence v. Trimble Navigation* Ltd., 484 F.3d 700, 705 (4th Cir. 2007); *HQM, Ltd. v. Hatfield*, 71 F.Supp.2d 500, 502 (D.Md. 1999). Those facts included in the complaint, which are drawn from Defendants' memoranda and exhibits and which Mr. Samuel treats as facts, will therefore be considered. Where Defendants' statements or evidence are included but disputed, the court will obviously not give credence to Defendants' interpretation at the motion to dismiss stage.

that Dolch and Uhlik were paid for their time spent shadowing. Plaintiff alleges that "at certain times when [Dolch and Uhlik] were shadowing they were still on the clock and being paid for their time by PAC."

Throughout all of the above conduct, Plaintiff alleges that "Local 333 had a duty to its members to ensure that training opportunities were properly posted and made available to all PAC employees[,]" yet failed to do so.  Plaintiff further alleges that "Local 333 failed to assert [Samuel's] rights under the CBA[.]" Plaintiff suggests that "PAC, STA, and Local 333 allowing Dolch and Uhlik to train and take over positions at the ICTF ahead of at least 22 African American PAC employees/Local 333 members, (and only 4 Caucasian PAC employees/Local 333 members) evidences the . . . the preferential treatment granted to Dolch and Uhlik, two Caucasians."

Plaintiff filed his complaint on February 9, 2019.  (ECF No. 1). Local 333 individually, and STA and PAC jointly filed motions to dismiss on July 22, 2019.  (ECF Nos. 12, 13).  On September 20, 2019, Plaintiff amended his complaint.  (ECF No. 18).  Defendants again moved to dismiss.  (ECF Nos. 23, 24).  On November 6, 2019, this court granted Plaintiff's unopposed motion for leave to file a Corrected First Amended Complaint in order to fix certain typographical errors in the complaint.  (ECF no. 28).  Nearly two months later, without having sought the leave of the court or

12

providing any explanation for doing so, STA and PAC filed a "corrected motion to dismiss." (ECF No. 32). Normally, the court would not consider such a motion, but as Plaintiff has not objected, and has since filed a response, (ECF No. 38), addressing STA and PAC's corrected motion, the court will consider it.[5] Defendants then replied to Plaintiff's response. (ECF Nos. 39, 40). These replies noted that Plaintiff, who avers additional facts in his response in order to address Defendants' arguments for summary judgment, failed to attach a necessary affidavit. Plaintiff has subsequently sought leave to file such an affidavit. (ECF No. 41). Local 333 opposed this motion, (ECF No. 42), as did STA and PAC, (ECF no. 43). Plaintiff replied. (ECF No. 44).

## II. Standard of Review

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the sufficiency of the complaint.[6] *Presley v. City of*

---

[5] As a result, the initial motion to dismiss (ECF No. 24) is deemed withdrawn.

[6] Local 333 moves to dismiss or, in the alternative, for summary judgment. As already discussed in a prior footnote, the court may, without converting a motion to dismiss into a motion for summary judgment properly "consider documents attached to the complaint. . . as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Philips v. Pitt Cty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir.2009) (citations omitted). Accordingly, Local 333's motion will be analyzed as a motion to dismiss.
 STA and PAC present a more difficult question, however. Those Defendants move to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). Yet, at every point in their papers where STA and PAC purport to be arguing that Plaintiff has failed to state a claim,

*Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). A plaintiff's complaint need only satisfy the standard of Fed.R.Civ.P. 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n. 3 (2007). That showing must consist of more than "a formulaic recitation of the elements of a cause of action"

---

they are actually raising factual disputes which are not properly before the court at the Motion to Dismiss stage. For example, one of the section headers in STA and PAC's self-styled motion to dismiss reads "There Is No Genuine Dispute That These Defendants Did Not Provide Training On CSX-Owned Sideloaders and Transtainers Until Late 2015[,]" (ECF No. 32, at 4), a clear invocation of the Summary Judgment standard. At another point, STA and PAC attack certain allegations in the complaint as "inaccurate," and make their argument through a combination of citations to contradictory evidence and conclusory assertions of fact without any citation at all. (*Id*. at 4-10). Such arguments are improper in a motion to dismiss. Despite relying exclusively on arguments which would only be proper on Summary Judgment, STA and PAC do not style their motion to dismiss as being in the alternative a motion for summary judgment. They do, however, suggest that "This Court Must Dismiss *or Enter Judgment* in Favor Of [*sic*] These Defendants" in a section header of their motion to dismiss. (ECF No. 32, at 13) (emphasis added). Adding to the confusion, PAC and STA have attached 21 exhibits to their motion to dismiss – and these exhibits are labelled as being exhibits to "Defendants' motion to dismiss *or alternatively for summary judgment*." (*See e.g.*, ECF No. 24-2, at 1) (emphasis added). And again, despite styling their motion as being exclusively a motion to dismiss, it is not clear that STA and PAC have raised a *single* proper argument for dismissal under either 12(b)(6) or 12(b)(1). A district court, however, may dismiss a complaint for failure to state a claim *sua sponte*, and where the face of a complaint plainly fails to state a claim for relief, the district court has "no discretion but to dismiss it." *Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 655 n. 10 (4th Cir. 2006) (internal quotations omitted).

14

or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).

At this stage, all well-pleaded allegations in a complaint must be considered as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and all factual allegations must be construed in the light most favorable to the plaintiff, see *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). In evaluating the complaint, unsupported legal allegations need not be accepted. *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989). Legal conclusions couched as factual allegations are insufficient, *Iqbal*, 556 U.S. at 678, as are conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). Ultimately, a complaint must "'permit[ ] the court to infer more than the mere possibility of misconduct' based upon 'its judicial experience and common sense.'" *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679).[7]

---

[7] As already mentioned, STA and PAC's motion to dismiss suggests that this case should be dismissed under either Fed.R.Civ.P. 12(b)(6) or 12(b)(1). That said, STA and PAC make no arguments for dismissal under Fed.R.Civ.P. 12(b)(1), and only mention Fed.R.Civ.P. 12(b)(1) in the first sentence of their memorandum of law. STA and PAC do argue, however, that "this case is deserving of dismissal as outside the statute of limitations and this court's jurisdiction[.]" (ECF No. 32, at 17).

**III. Analysis**

Plaintiff originally brought two claims: disparate treatment in violation of 42 U.S.C § 1981, and retaliation in violation of 42 U.S.C § 1981. In his response, however, Plaintiff states that he "withdraws his retaliation claims." (ECF No 38-1, at 15).

To maintain a discriminatory denial of training claim, a plaintiff must allege that: (1) he is a member of a protected class; (2) the employer provided training to its employees; (3) the plaintiff was eligible for the training; and (4) he was not provided training under circumstances giving rise to an inference of discrimination. *See Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649–50 (4th Cir. 2002). Here, Mr. Samuel sufficiently alleges the first element and, arguably, the second.[8] As to the third and fourth elements, even under the most generous reading of Plaintiff's incredibly confusing complaint, Plaintiff has still not pleaded sufficient factual matter to allow the court to

---

Fed.R.Civ.P.12 (b)(1) deals with lack of subject matter jurisdiction. "[T]he fact that the statute of limitations may have expired on [a] § 1981 claim is a defense to the claim . . . and not a jurisdictional defect." *Hux v. Hyatt Corp.*, 187 F.3d 629 at *2 (4th Cir. 1999) (unpublished table opinion).

[8] The complaint is not entirely clear as to the second element. Plaintiff takes issue with training given to Dolch and Uhlik, much of which appears to have occurred at the ICTF prior to PAC's taking ownership of that facility. While Plaintiff alleges that PAC "provided the labor" at the ICTF even prior to owning the facility, it is not entirely clear that PAC had sole responsibility for training its employees at a facility then owned by another entity.

16

determine that Mr. Samuel was (1) eligible for all of the training which he claims he was denied, (2) was actually denied training, or (3) was actually denied training under circumstances giving rise to an inference of discrimination. Mr. Samuel was provided virtually all of the training he sought. The complaint makes clear that he was able to train on and perhaps even to receive certification for the Top Loader and Side Loader. It even appears to be distinctly possible from even a generous reading of the complaint that Mr. Samuel received some of these certifications *before* Dolch and Uhlik did.

More importantly, Mr. Samuel's allegations are "inadequate under *Iqbal* and *Twombly* to infer discrimination." *Roberts v. Office of the Sheriff for Charles Cty.*, No. CIV.A. DKC 10-3359, 2012 WL 12762, at *6 (D. Md. Jan. 3, 2012) (citing *Fletcher v. Philip Morris USA Inc.*, No. 3:09CV284–HEH, 2009 WL 2067807, at *6 (E.D.Va. July 14, 2009) (holding that an African–American plaintiff's allegation that "similarly situated whites, females, and non-black males" were treated differently "falls short of plausibility" with respect to a disparate treatment claim); see also *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 191 (4th Cir. 2010) (holding that an African–American plaintiff's allegation that he "was treated differently as a result of his race than whites" was too conclusory to state a disparate treatment claim).

Mr. Samuel attempts to bolster his conclusory allegation that Defendants' action were "motivated by racial animus and race-based discrimination," (ECF No. 29, ¶ 37), by noting that 22 of the grievants who Dolch and Uhlik allegedly jumped ahead of for training opportunities were African American. (*Id*. ¶ 36). By the same token, though, Mr. Samuel readily admits that four of the grievants were White. (*Id*.). Mr. Samuel also notes that two other African American employees, Malcom Lynch and William Perry, were told that they were ineligible for certain types of training. (*Id*., ¶¶ 24, 27). Mr. Samuel, however, provides no other meaningful information about these other employees except that they are African American. (*Id*.) Without anything more, it is impossible for the court to discern whether these employees were eligible for the trainings they were allegedly denied.

In sum, there are no indications of racially discriminatory overtones that can be gleaned from PAC and STA's training practices, or from Local 733's inaction. At most, Mr. Samuel has alleged seniority violations and a strange, inconsistent, or idiosyncratic approach to training by his employers. In a race discrimination case, however, the "crucial issue" is whether "an unlawfully discriminatory motive for a defendant's conduct [exists], not the wisdom or folly of its business judgment." *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 383 (4th Cir. 1995).

The circumstances described in the complaint simply do not give rise to an inference of discrimination.

## IV. Conclusion

For the foregoing reasons, Plaintiff has failed to state a claim upon which relief will be granted.  Defendants' motions to dismiss will be granted.  Because the complaint will be dismissed pursuant to Fed.R.Civ.P. 12(b)(6), Plaintiff's motion to submit affidavits pursuant to Fed.R.Civ.P. 56(e)(1), (ECF No. 41), will be denied as moot.  A separate order will follow.

                                                                                               /s/
                                          DEBORAH K. CHASANOW
                                          United States District Judge